IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TED ROBERTS, an individual, | ) ) ) |
| Plaintiff, | ) ) ) |
| | ) Case No. CV 05-472-S-EJL-MHW |
| v. FEARLESS FARRIS SERVICE STATIONS, INC., an Idaho corporation; FEARLESS FARRIS SERVICE STATION, INC., THE DEFERRED COMPENSATION PLAN; FARRIS S. LIND; KENT F. LIND; H. KENT JOHNSON; CHARLEY JONES; and SHAWN DAVIS, individually and as Present or Former Administrators and Fiduciaries of the Fearless Farris Service Stations, Inc. | ) ) ) **REPORT AND RECOMMENDATION** ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Currently pending before the Court are the following: 1) Defendants Farris Lind, Kent Lind, and H. Kent Johnson's Motion for Summary Judgment (Docket No. 32), filed January 23, 2007; 2) Defendants Shawn Davis, Charley Jones, Fearless Farris Service Stations, Inc., and Fearless Farris Service Station, Inc. Deferred Compensation Plan's Motion to Strike Demand for

**Report and Recommendation - Page 1**

Jury Trial (Docket No. 36),[1] and a Motion for Summary Judgment (Docket No. 37), both filed January 23, 2007, and 3) Defendants Shawn Davis, Charley Jones, Fearless Farris Service Stations Inc., and Fearless Farris Service Stations, Inc., Deferred Compensation Plan's Motion to Strike Portions of Affidavits in Support of Plaintiff's Brief in Opposition to Motions for Summary Judgment (Docket No. 62), filed March 30, 2007.

## REPORT

### I.
### Background

**A.     History of Fearless Farris Ownership and Plaintiff's Employment**

Plaintiff Ted Roberts ("Plaintiff" or "Roberts") was employed as a driver by Westpoint Transportation, Inc. ("Westpoint") beginning approximately in February 1981. (Deposition of Ted Roberts ("Roberts Dep."), attached as Exhibit A to the Affidavit of Candy W. Dale ("Dale Aff.") in Support of Motion for Summary Judgment, Docket No. 37-4, p. 60, ll. 7-9.) Westpoint is a wholly owned subsidiary of Fearless Farris Wholesale, Inc. (Deposition of H. Kent Johnson ("Johnson Dep."), attached as Exhibit B to the Dale Aff., p. 10, ll. 9-15.) Defendant Fearless Farris Services Stations, Inc. ("Fearless Farris") was a separate corporation which owned Fearless Farris Wholesale, Inc. (*Id*. at ll. 16-19; Deposition of Charley Jones, ("Jones Dep."), attached as Exhibit E to the Dale Aff., p. 6, ll. 18-25.) Prior to November 18, 2002, Fearless Farris was owned by Defendants Farris S. Lind, Kent Lind, and H. Kent Johnson ("Linds/Johnson"). Around November 18, 2002, Fearless Farris was purchased by Defendants Charley Jones and Shawn Davis ("Jones/Davis"). (*Id*.; Johnson Dep., Ex. 17; Complaint and

---

[1] At the hearing on June 6, 2007, Plaintiff's counsel conceded that under Ninth Circuit authority, he was not entitled to a jury trial in this case and withdrew his opposition to this motion. Accordingly, the Motion to Strike Demand for Jury Trial (Docket No. 36) is moot.

**Report and Recommendation - Page 2**

Demand for Trial by Jury, "Complaint," Docket No. 1, ¶ 14.)

## B.     Fearless Farris Deferred Compensation Plan

In the early to mid 1980's, Fearless Farris, as a sponsor, created a Deferred Compensation Plan, known as the Fearless Farris Service Stations, Inc. Deferred Compensation Plan ("the Plan").  (Johnson Dep., p. 14, l. 6 - p. 15, l. 17; Defendants Linds/Johnson's Responses to Plaintiff's First Requests for Admission, "Linds/Johnson's Admissions," attached as Exhibit B to the Affidavit of Glenda M. Talbutt in Support of Defendants Linds/Johnson Motion for Summary Judgment, "Talbutt Aff.," Docket No. 35, Nos. 1, 18.)  The participating employers in the Plan were Fearless Farris, Westpoint and Fearless Farris Wholesale, Inc.  (*Id*.)  There was no formal writing describing the Plan aside from letters and memorandum distributed to Plan participants over the years.  (Johnson Dep., p. 14, l. 6 - p. 15, l. 17; Roberts Dep., Exs. 1, 2, 3, 4, 5.)  Linds/Johnson did not consult any legal or financial advisors in developing the Plan.  (*Id*.)  In his deposition, Johnson stated that the intent of the Plan was to provide an incentive for "people that were key to the organization" to continue working there.  (Johnson Dep., p. 87, ll. 10-19.)[2]  Johnson also stated that the intent was that a person who was still employed with Fearless Farris at age 65 would qualify for benefits under the Plan.  (*Id*., p. 100, ll. 7-21.)[3]

The Plan went through several changes over the years.  In November 1984, the agreement stated that Plaintiff would be paid $600 a month at the "age of 65, for 15 continuous years" for "his good and faithful service through these many years."  The accompanying

---

[2] Plaintiff objects to the characterization that the Plan participants were "key" employees, he contends they were not key employees under ERISA's definitions.

[3] Plaintiff objects to this statement of Johnson's, he does not believe that early versions of the Plan required that one be employed to age 65 to receive any benefits.

**Report and Recommendation - Page 3**

memorandum stated the payment would be for "15 years after [his] retirement at age 65." (Roberts Dep, Ex. 1.) In December 1990, a letter to Ted Roberts from Linds/Johnson stated that "[u]pon retirement from Fearless Farris...at age 65, you will receive $9000 annually for a period of 15 years." (*Id*., Ex. 2.)

In February 1991, a memo was distributed stating that there was a "new employee benefit plan which takes the place of and supersedes any of the plans currently in effect for those people." It further stated that "[i]n order to qualify for this plan, the employee must be fully employed in any of the following categories, maintenance, freight drivers, supervisors or staff" and that full time employment must have been for at least three years. It also listed 17 employees who would be participating in the new plan. (*Id*., Ex. 3.) In August of 1991, Plaintiff signed another agreement that stated if his death occurred before age 65, Fearless Farris would give $19,200 per year for 15 years to his beneficiary or at retirement, age 65, Plaintiff would be paid $9600 per year for 15 years. (*Id*., Ex. 4.)

The last revision of the Plan occurred in 1995. It stated:

> [The Plan] will pay to the qualified employee or his surviving beneficiary, upon reaching the retirement age of 65 and having completed a minimum of 20 years of service to the Company, a monthly sum of 25% of the average of his/her last 5 years of service for a period of 15 years.

(*Id*., Ex. 5.)

Fearless Farris purchased and maintained life insurance policies on its employees participating in the Plan. (Johnson Dep., p. 104, l. 16 - p. 15, l. 10.) While Linds/Johnson were the owners of Fearless Farris, Fearless Farris was the owner and sole beneficiary of every life insurance policy. (*Id*.) The life insurance policies were an additional asset of Fearless Farris and

were never committed in any written documents as funds to pay benefits pursuant to the Plan. (*Id*., p. 40, l. 6 - p. 41, l. 8, p. 42, ll. 9-21, p. 104, l. 16 - p. 105, l. 10.)  The policies were also subject to the general claims of company creditors.  (*Id*., p. 105, ll. 3-5.)  Johnson did state in his deposition that it was a "possible" interpretation that the insurance plans were funding the retirement benefits.  (*Id*., p. 64, l. 16 - p. 65, l. 5.)  However, according to Johnson, there was no fund specifically set aside to pay the retirement benefits and employees never contributed to the Plan.  (*Id*., p. 19, ll. 11-18, p. 50, ll. 17-21, p. 100, ll. 22-24,  p.101, ll. 1-9.)  Plaintiff asserts that different representations were made to the Participants - namely, that there was a connection between the insurance policies and the Plan.

Towards the end of Linds/Johnson's ownership of Fearless Farris, and in connection with a pending sale, it was realized that there had never been any filing with the Internal Revenue Service (IRS) regarding any aspect of the Plan.  Subsequently, Form 5500's were filed with the IRS covering a 12 year time span for the years 1990 to 2002.  (Talbutt Aff., Ex. F-24.)  These filings indicated that the funding of the Plan was through "general assets of the sponsor."  (*Id*.)  The Summary Annual Reports for these years stated that the "value of plan assets was $0 as of [the end of the plan year] compared to $0 as of [the beginning of the plan year].  During the plan year the plan experienced an increase in its net assets of $0...The plan had total income of $0."  (*Id*.)

C.  **Sale and Purchase of Fearless Farris**

On August 22, 2002, Linds/Johnson entered into a Stock and Asset Purchase Agreement to sell Fearless Farris to Jones/Davis.  (Talbutt Aff., Ex. F-17.)  The actual closing of the transaction occurred on November 18, 2002.  (Talbutt Aff., Ex. A., Johnson Dep., p. 53, ll. 17-

20.) Following the sale, Lind, Lind and Johnson were given their own individual life insurance policies. (*Id.*, p. 55, ll. 14-17; Talbutt Aff., Ex. E., Jones Dep., p. 13, l. 12 - p. 14, l. 3; Talbutt Aff., Ex. F-17, § 426.15.) The remaining life insurance policies, including the one maintained on Plaintiff's life, and liability for all premium payments were retained by Fearless Farris as part of the purchase by Jones/Davis. (Jones Dep., p. 13, l. 12 - p. 14, l. 3; Talbutt Aff., Ex. F, §§ 3.1.20, 3.2.8, and 4.26.15.) All employee benefit plans, including the Plan, were also retained by Fearless Farris as part of the sale and purchase. (*Id*. §§ 3.2.5, 4.25, 4.26 and Schedule 4.23.)[4] When the company was sold, there were 30 participants in the Plan. (Johnson Dep, Ex. 17.) There were approximately 450 employees employed by Fearless Farris, Fearless Farris Wholesale and Westpoint at that same time. (Johnson Dep., p. 101, ll. 10-23.) After November 18, 2002, Linds/Johnson had no further involvement with Fearless Farris. (*Id*. Talbutt Aff., Ex. G, Deposition of Farris Lind "Lind Dep.," p. 13, ll. 21-22.)

## D.    Cashing in Life Insurance Policies & Dissolution of Fearless Farris Deferred Compensation Plan

After the closing of the sale, Jones took steps to get control of the life insurance policies which had been pledged as collateral for a loan by Linds/Johnson. (Johnson Dep., p. 14, l. 12 - p. 15, l. 10.) In December 2002, Jones contacted Dwain Wilde, a representative of AmerUS Insurance, and informed him that he wanted to cash out all the life insurance policies on the employees' lives, with the exception of one employee who was terminally ill. (Talbutt Aff., Exs. F-18, F-19.) The following month, Mr. Wilde confirmed to Jones that the policies would be cancelled and when completed, Jones would be receiving the cash surrender value that exceeded

---

[4] Plaintiff contends in paragraph 4.26 of the Stock and Asset Purchase Agreement, the parties "collude to set up the Buyers in a position to disavow any responsibility to the employees in paragraphs 4.26.10 and 4.26.11." (Plaintiff's Brief in Opposition to Motions for Summary Judgment, "Plaintiff's Brief," Docket No. 54, p. 10.)

**Report and Recommendation - Page 6**

$600,000.00.  (*Id*., Ex. F-21.)  The funds from the cash surrender values were deposited into the corporate accounts of Fearless Farris and Fearless Farris Wholesale, Inc.  (Talbutt Aff., Ex. E., Jones Dep., p. 9, l. 21 - p. 10, l. 18.)

Shortly after this, Jones and Davis decided to terminate the Plan.  In July 2003, Jones and Davis held meetings and distributed memoranda informing the Plan participants, including Plaintiff, that the Plan was going to be terminated and essentially that they should not rely on it for retirement benefits.  (Jones Dep., p. 25, ll. 22-25, p. 26, l. 15 - p. 28, l. 19; *Id*., Ex. 6.)  Plaintiff signed an acknowledgment that he had received notice of the termination and that he understood termination "extinguishes all present and future claims for benefits under the Plan..." (Roberts Dep., Ex. 200.)

Prior to the sale of Fearless Farris to Jones/Davis, one participant had retired from the company.  His benefits were paid out of the company's general fund of working capital.  (Johnson Dep., p. 101, ll 1-9.)  When Jones and Davis decided to terminate the Plan, they stated in their memorandum that they planned to pay benefits to those individuals who had worked for the company for twenty years and were within five years of retirement.  (Jones Dep., Ex. 6; Jones Dep., p. 53, ll. 11-23.)  Jones stated they did so because they felt a "moral and ethical obligation to make good on promises of the former owners to specific employees who had worked for this company for a number of years and, in fact, had retired from the company."  (*Id*.)

### E. Plaintiff's Termination

On August 18, 2003, Plaintiff's employment with Fearless Farris was terminated.  He had worked for the company for 22 years and was 48 years old.  (Roberts Dep., p. 11, ll. 13-15; p. 62, ll. 5-11; Complaint ¶ 16.)  After his termination, Plaintiff filed a wrongful termination suit

against Fearless Farris and Westpoint in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada. (Dale Aff., Ex. C.) At the time of his termination Plaintiff was a fuel transport driver. He alleged he was wrongfully terminated in violation of public policy because of his alleged refusal to violate federal law and regulations pertaining to highway safety and/or in retaliation for representing the concerns of other drivers to management. (*Id.*) The case went to trial and the jury returned a verdict for the defendants Fearless Farris and Westpoint. (*Id.*, Ex. D.)

**F.    Plaintiff's Complaint**

Plaintiff brought this action for legal and equitable relief under ERISA on November 18, 2005. Count One of Plaintiff's Complaint, the singular count in his Complaint, is a "Claim for Benefits." The Claim is seven sentences in length and alleges the Defendants "breached a duty" to the Plan and the plan participants.

As to the general allegations in Count One, Plaintiff alleges that the Plan Fiduciaries (including Linds/Johnson, Jones/Davis and Fearless Farris) breached a duty and are liable for the misuse and loss of plan assets. He seeks an order that he is entitled to a lump sum distribution of his early retirement benefits and that Linds/Johnson and Jones/Davis are jointly and severally liable for payment of the funds owed to him. In the alternative, he seeks an order compelling these defendants to establish and fund a trust to provide Plaintiff with full benefits at age 65.

The Court recognizes that notice pleadings are permitted under the Federal Rules of Civil Procedure, but the statutory provisions of the ERISA statutes are complex, as is the relief that a court can order. For example, when a plan administrator has violated a fiduciary duty, a plan participant may not seek individual relief for that violation, but any benefit would enure to the

**Report and Recommendation - Page 8**

benefit of the plan and all plan participants as a whole.  *See Cline v. Indus. Maint. Eng'g & Contracting, Co.*, 200 F.3d 1223 (9th Cir. 2000); *Landwehr v. DuPree*, 72 F.3d 726 (9th Cir. 1995).  The particular section of the ERISA statute under which a plaintiff is seeking relief can also be important.

It has been difficult for the Court to identify the specific provisions of ERISA that Plaintiff claims have been violated as they relate to the relief he seeks.  I would recommend that either the Plaintiff be ordered to file an amended complaint setting forth in detail the statutory provisions that he is proceeding under, or that this be done pursuant to a pretrial order so that the Court and all parties are on notice of the parameters of the claims to be addressed by this litigation.

## II.
## Defendants' Motion for Summary Judgment

**A.**     **Standard of Review**

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. Rule 56, which provides in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (1993).  A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains

**Report and Recommendation - Page 9**

by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.,* at 250. "When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.,* at 254. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party. To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law. *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir. 1992). The Ninth Circuit has found that in order to resist a motion for summary judgment,

**Report and Recommendation - Page 10**

> the non-moving party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund,* 882 F.2d 371, 374 (9th Cir. 1989).

### B.     Motions for Summary Judgment

Defendants Linds/Johnson move for summary judgment partially on the grounds that their involvement, control, authority and/or responsibility for the Plan ended on November 18, 2002 when they sold Fearless Farris to Jones/Davis. They maintain they had no control over the decisions later made by Jones/Davis, including the liquidation of the insurance policies on the lives of the Plan participants, termination of the Plan and termination of Plaintiff's employment. These Defendants also assert that the liquidation of the policies was not done in connection with the sale of Fearless Farris. They argue that as the Plan was maintained and sponsored by Fearless Farris, the corporate entity, and any fiduciary duty would be owed by Fearless Farris and not the individual shareholders.

In response to this argument, Plaintiff maintains: (1) there is no authority cited for the proposition that Linds/Johnson had a right to contract out of any *past* responsibility they had under ERISA; (2) if the Plan is not a top-hat plan, they are fiduciaries under ERISA Section 401 *et seq.* and such responsibilities are not so easily relinquished; and (3) if the Plan was a top-hat plan, it could be analyzed under contract principles and they would still be considered parties to the "contracts" at issue.

**Report and Recommendation - Page 11**

Both the Fearless Farris Defendants and Defendants Linds/Johnson argue that Plaintiff did not qualify for benefits under the terms of the Plan. Defendants Linds/Johnson first point out that the Plan was terminated in July 2003, Plaintiff was terminated a month later, and no Plan existed at that time. They maintain even if the Plan was in existence, that retirement was the triggering event and since that prerequisite was not satisfied, Plaintiff was not eligible for benefits. They also assert that Plaintiff was only 48 years old at the time of his termination and that a participant must be 65 years old in order to qualify for benefits under the terms of the Plan. Additionally, under the early retirement provision of the Plan, which reduced benefits by 10% for each year a participant was under the age of 65, these Defendants maintain Plaintiff would not be entitled to benefits as he was 17 years below the age of retirement, which would reduce his benefits by more than 100%.

The Fearless Farris Defendants maintain that the Plan in effect at the time Jones/Davis acquired the company was set forth in a memorandum dated December 19, 1995. (Roberts Dep., Ex. 5.) The terms of the Plan at that time required a participant to be employed with Fearless Farris for 20 years and to retire at age 65. They first assert that the Plan was terminated so there is no Plan from which to give Plaintiff benefits. As Plaintiff was terminated and did not retire, they also submit he is not entitled to anything under the terminated Plan. The Fearless Farris Defendants maintain that the Plan clearly requires two things, for the employee to work for 20 years and to retire at age 65 and as Plaintiff only satisfied one requirement, the years of service, he does not qualify benefits. Addressing the early retirement provision of the Plan, the Fearless Farris Defendants first assert that this shows Fearless Farris intended its participants to retire in order to receive benefits and also that even under the early retirement provisions, Plaintiff would

**Report and Recommendation - Page 12**

not qualify for benefits.[5]  Lastly, these Defendants assert that the Plan was not ambiguous and that Plaintiff cannot attempt to defeat summary judgment by stating there is an ambiguity.

Plaintiff maintains that there are several disputed facts that warrant a denial of both motions for summary judgment, including: whether the memorandum dated December 19, 1995 divested participants of vested rights; what the Plan required in terms of age and service requirements as a condition to receiving benefits; and whether Defendants Linds/Johnson were able to abdicate their fiduciary or contractual obligations and responsibilities under the Plan.

Plaintiff contends that as the law prohibits the divesting of benefits, which the 1995 memorandum purported to do, he is still entitled to benefits – those he would receive at age 65 based on 22 years of service.  He contends that this memorandum had the effect of taking back promised payments and stripping 10% of an employee's vested interest for each year that he does not continue in employment until age 65.  Plaintiff also points out that Fearless Farris made representations to the Plan participants that the Plan was funded.  (Affidavit of Robert C. Huntley, "Huntley Aff.," Docket No. 56, Exs. 2, 5.)

Plaintiff argues the Plan does not require that he still be employed by Fearless Farris at age 65 in order to receive benefits, but that after 20 years of working, at age 65 he is to receive benefits.  Additionally, he asserts that the changes made to the Plan in 1995 are not effective as Fearless Farris could not unilaterally change the Plan after Plaintiff had accepted the offer of the Plan and as well, the changes are ambiguous.  Plaintiff submits that there are fiduciary violations, such as not maintaining a written plan, that Defendants have violated.

---

[5] The Fearless Farris Defendants quote the deposition testimony of Plaintiff from his wrongful termination litigation in state court as well as his deposition in this litigation in which he stated, respectively: "...I would have had to been 55 years old to qualify for any of it" and in response to what he would receive at age 48 under the 1995 Plan, "Zero." (Dale Aff., Ex. F., p 81, ll. 17-25, p. 85, ll. 7-21; Dale Aff., Ex. A., p. 5, l. 21- p. 51, l. 18.)

**Report and Recommendation - Page 13**

**C.**     **Analysis.**

In general, ERISA applies to an employee benefit plan, if it established or maintained by an employer engaged in commerce, or in any industry or activity affecting commerce. 29 U.S.C. § 1003(a)(1). To qualify as a "pension plan" covered by ERISA, a plan must provide retirement income to employees or result in the deferral of income by employees for periods extending to the termination of employment or beyond. *Id*. § 1002(2)(A). Defendants Linds/Johnson have admitted the Plan was subject to ERISA.

Two of the main types of pension plans are defined benefit plans and defined contribution plans, also known as individual account plans. A defined contribution plan provides for an individual account for each participant and benefits are based solely upon the amount contributed to the participant's account. 29 U.S.C. § 1002(34). A defined benefit plan is defined as any plan other than a defined contribution plan. *Id*. 1002(35). Defined benefit plans typically promise a fixed monthly amount upon retirement, either a flat payment or payment based on formula, such as years of service and earnings. For purposes of discussion, the Court notes that the Plan at issue appears to be a defined benefit plan as it provided, initially, for a flat benefit amount per month and later an amount based on salary, age at retirement and years of service.

ERISA does not mandate that employers establish employee benefit plans. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983). But when employers choose to create a pension plan, they must comply with ERISA's statutory participation, funding, accrual and vesting requirements. *Id*. For example, the vesting provision sets the minimum level of benefits an employee must receive after accruing specified years of service. *Hughes Aircraft Co. v.*

*Jacobson*, 525 U.S. 432, 441 (1999).  The current version of ERISA contains two basic vesting schedules in regards to employer contributions in defined benefit plans.  One provides that after five years of service under the plan, the employee is 100% vested.  The other schedule provides that employees become 20% vested after three years of service under the plan and continue to vest at a rate of 20% each year thereafter until they are 100% vested after seven years of service.  29 U.S.C. § 1053(a)(2)(A)(ii), (iii).  These are the minimum schedules needed for compliance and plans may have faster vesting schedules.

Certain types of plans are exempt from these substantive provisions of ERISA relating to vesting, accrual and funding.  In particular, "top-hat" plans are exempt.  A top-hat plan is an unfunded deferred compensation plan maintained by employers primarily for the purposes of providing deferred compensation for a select group of management or highly compensated employees.  *See* 29 U.S.C. § 1051(2), § 1081(a)(2), § 1101(a)(1).  "Top-hat" plans are subject to ERISA's administrative and enforcement provisions, but exempt from the substantive provisions that regulate vesting, participation, funding and impose fiduciary duties.  *Garratt v. Knowles*, 245 F.3d 941, 946 (7th Cir. 2001).

The Court will not determine at this time whether the Plan was a "top-hat" plan that would be exempt from ERISA's substantive provisions.  Although the parties did discuss the top-hat issue in their briefing to some degree, the Court finds that there are genuine issues of material fact that would preclude the determination of that issue at this time.  The Court will note, however, that if this Plan is *not* a top-hat plan, it appears that it would need to comply with the minimum standards set forth by ERISA.

Whether Defendants are willing to concede that this is not a "top hat" is unclear.

**Report and Recommendation - Page 15**

Defendants spent a considerable amount of time discussing in their briefs why minimum vesting requirement are not required under a top hat plan and unless Defendants are willing to concede the point, I would recommend this Court follow the procedures employed by the United States District Court for the Northern District of Texas in bifurcating various issues for trial purposes.

In *Carrabba v. Randalls Food Markets, Inc.,* 38 F. Supp. 2d 468 (N.D. Tex. 1999) the court first concluded after a court trial that while the defendant had always considered the plan to be a top hat plan, it was in fact not a top hat plan. The defendant failed to prove by a preponderance of the evidence that the plan was maintained for a select group of management or highly compensated employees as those terms were used in ERISA. That led the to the second phase of the litigation.

In *Carrabba v. Randalls Food Market, Inc.,* 145 F. Supp. 2d 763 (N.D. Tex. 2000), *aff'd,* 252 F.3d 721 (5th Cir. 2001), *cert. denied,* 534 U.S. 995 (2001), the district court issued its findings following a second bench trial. After considering the evidence, the court found that equitable relief was required to address the employer's violations of, and to give effect to, the accrual and vesting provisions of ERISA.

There are other issues that would be appropriate for resolution at the first bench trial. For example, the arguments by Linds/Johnson that their liability, if any, would cease once they sold their interest in Fearless Farris. The Court cannot make a finding as a matter of law at this time whether the sale of Fearless Farris abdicated Linds/Johnson's liability for the alleged ERISA violations. In part, their argument is that because Fearless Farris was the Plan sponsor, to extent there was any fiduciary duty owed, it was owed by the company, not by Linds/Johnson. ERISA defines a person or entity to be a fiduciary to the extent such person or entity exercises either any

**Report and Recommendation - Page 16**

discretionary authority or control respecting management of the plan, or exercises any authority or control respecting management or disposition of its assets.  29 U.S.C. § 1002(21)(A)(I). ERISA does not limit fiduciary status to plan sponsors, in fact, the Fourth Circuit has held that a plan sponsor does not automatically become a fiduciary simply by performing settlor-type functions such as establishing a plan and designating benefits.  *Coyne & Delany Co. V. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996).  To the extent that fiduciary violations may be alleged, there are genuine issues of fact whether Linds/Johnson would be considered "fiduciaries" under ERISA.  Also, at the first trial, the Court can consider whether the 1995 amendment illegally deprived Plaintiff of vested rights that he had under earlier versions of the Plan, as he contends. There may other issues identified by counsel that would also be appropriate for resolution at the first bench trial.

### III.
### Fearless Farris Defendants' Motion to Strike Portions of Affidavit

The Fearless Farris Defendants have moved to strike Exhibits 7, 9, 10 of the Huntley Affidavit (Docket No. 56) and Paragraphs 9-11 and Appendix A of Affidavit of Plaintiff Ted Roberts in Support of Plaintiff's Brief in Opposition to Motions for Summary Judgment (Roberts Aff., Docket No. 55).  The Linds/Johnson Defendants have joined in this Motion.  (Docket No. 64).  Defendants seek to strike these portions of these affidavits because they either address the "top-hat" status of the Plan or Plaintiff's termination, both of which are irrelevant to these motions for summary judgment.  The Court will strike those portions of the affidavits[6] that discuss Plaintiff's termination as that issue is irrelevant and will strike Exhibit 7 of the Huntley Affidavit for lack of foundation.

---

[6] Specifically, the Court will strike Huntley Aff., Ex. 7, and Roberts Aff. ¶¶ 10-11 and Appx. A.

**Report and Recommendation - Page 17**

## **RECOMMENDATION**

Based upon the foregoing, the Court being otherwise fully advised in the premises, the Court **hereby RECOMMENDS that:**

1)      Defendants Farris Lind, Kent Lind, and H. Kent Johnson's Motion for Summary Judgment (Docket No. 32), filed January 23, 2007, be **DENIED**;

2)      Defendants Shawn Davis, Charley Jones, Fearless Farris Service Stations, Inc., and Fearless Farris Service Station, Inc. Deferred Compensation Plan's Motion for Summary Judgment (Docket No. 37), filed January 23, 2007, be **DENIED**;

3)      Defendants Shawn Davis, Charley Jones, Fearless Farris Service Stations, Inc., and Fearless Farris Service Station, Inc. Deferred Compensation Plan's Motion Strike Portions of Affidavits in Support of Plaintiff's Brief in Opposition to Motions for Summary Judgment (Docket No. 62), filed March 30, 2007, be **GRANTED IN PART and DENIED IN PART**;

4)      Defendants Shawn Davis, Charley Jones, Fearless Farris Service Stations, Inc., and Fearless Farris Service Station, Inc. Deferred Compensation Plan's Motion to Strike Demand for Jury Trial (Docket No. 36), filed January 23, 2007, be found **MOOT**.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1, or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.



DATED: August 6, 2007

*[signature]*

Honorable Mikel H. Williams
Chief United States Magistrate Judge

**Report and Recommendation - Page 19**